UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WHIRLPOOL CORPORATION,
           Plaintiff / Counter-Defendant,,

No. 1:06-cv-195

-v-

HONORABLE PAUL L. MALONEY

GRIGOLEIT COMPANY,
           Defendant / Counter-Plaintiff.

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

      This matter comes before the Court on Plaintiff / Counter-Defendant Whirlpool's ("Plaintiff" or "Whirlpool") motion (Dkt. No. 79) for partial summary judgment. Defendant / Counter-Plaintiff Grigoleit ("Defendant" or "Grigoleit") filed a response. (Dkt. No. 88.) Plaintiff filed a reply. (Dkt. No. 90.) Through the motion, Plaintiff seeks to limit the amount of damages Defendant may claim in its counter claim.

I. BACKGROUND[1]

      Defendant Grigoleit supplied knobs to Plaintiff Whirlpool for various appliances. As the

---

[1]The parties' lexicon has not been clearly explained in their briefs, which makes it more difficult to resolve this dispute. A "blanket purchase order" or "blanket PO" would be a standing purchase order issued by Whirlpool to Grigoliet. "Whirlpool Part Volume Commitment" refers to a commitment by Whirlpool to purchase a specific volume of particular parts from Grigoleit over some unknown period of time. The term "Whirlpool release" is especially confusing. From the samples provided (Dkt. No. 88-25, Brief in Response - Attachments to Winick Affidavit), a release includes directions by Whirlpool for Grigoleit to manufacture certain parts (firm to manufacture), procure raw materials in anticipation of future firm to manufacture orders, and Whirlpool plans. It is unclear if a release includes an authorization to ship parts which have been manufactured pursuant to a release. Grigoleit's "order balance" appears to refer to the remaining balance of Whirlpool's Part Volume Commitment for each particular part, although how that is or was calculated is unclear. "Grigoleit's Item/Order Due Listing" seems to refer to a balance sheet reflecting the volume commitment, parts ordered on a release and the order balance, among other things.

result of circumstances which form the basis for Plaintiff's complaint, and which are not relevant for this motion, the parties entered into negotiations for a new contract in late 2004 and early 2005. On December 22, 2004, Grigoleit informed Whirlpool that it would terminate the blanket orders as of January 31, 2005 if the problems were not resolved. (Dkt. No. 80-11, Exhibit 9 to Plaintiff's Brief in Support - Winick email dated 12/22/04). The parties agree Grigoleit terminated Whirlpool's blanket purchase orders on January 31, 2005. (Plaintiff's Brief in Support at 4; Defendant's Response at 4.) However, Grigoleit continued to manufacture parts ordered before the blanket purchase orders were terminated. (Winick Deposition at 153.)

On February 25, 2005, Mr. Tim Slade, who worked for Plaintiff Whirlpool, faxed Mr. Joel Winnick at Grigolet a document with the following comment on the cover page: "Per our email send [sic] at 7:30 p.m. EST with our offer please sign and return by Monday, Feb. 28, 2005 at 10:00 am CST." (Dkt. No. 40-2, Exhibit A to Counterclaim.) The document is not a model of clarity. The document sent was five pages long. The first two pages are titled "Whirlpool/Grigoleit Agreement" and includes ten paragraphs, including

> 2. Prices per ATTACHMENT A are immediately effective and are based on immediately increasing the current Grigoleit order balances (as defined by the "mutually defined" period) by the "WHIRLPOOL PART VOLUME COMMITMENT" quantity shown in ATTACHMENT A for each blanket PO.
>
> 4. Grigoleit will process Whirlpool releases weekly on the first Grigoleit business day of receipt of same. Whenever the future cumulative order balance shown on a Whirlpool release, i.e., the total "Released Quantity" scheduled in the first 8 full weeks of a Whirlpool release, beginning with the week the release is received, which is herein established as the firm commitment period, and adjusted for any quantities in transit, exceeds the "Whirlpool Part Volume Commitment" order balance. Grigoleit will provide weekly at the end of business on the 2nd working day, or otherwise as requested by Whirlpool, provide Whirlpool with copies of our Item/Order Due Listing showing the Grigoleit order balances, scheduled ship dates, and unscheduled quantities in our 98/98 code. If Whirlpool elects to purchase any part number with a volume commitment of zero in the "Whirlpool Part Volume

>Commitment" column of Attachment A, Whirlpool agrees to purchase a one time quantity of 1000 parts at the price listed on the price list. Any order for part numbers with zero commitment in the "Whirlpool Part Volume Commitment" column of Attachment A, will be ordered with a minimum 8 week lead time.
>
>5. Whirlpool is responsible for all quantities of finished parts, components, and raw materials that are processed and/or procured by Grigoleit in meeting its obligations under previous and new blanket PO's. Such quantities may exceed the amount required to cover actual quantities of finished parts shown on the Grigoleit order balance at a given time. The total Whirlpool liability under this paragraph shall not exceed $100,000 and shall be limited to obligations supported by Grigoleit inventory or other records as follows:
>   a. Finished parts shall be paid by Whirlpool at ATTACHMENT A price.
>   b. In process components shall be paid by Whirlpool at Grigoleit stated percentage of completion of ATTACHMENT A price.
>   c. Raw material, which includes purchased components, committed and on hand shall be paid by Whirlpool at Grigoleit laid-in invoice price plus thirty percent. Grigoleit shall ship any parts, components, and raw materials covered under this paragraph as directed by Whirlpool
>
>6. Grigoleit shall ship to Whirlpool according to Whirlpool weekly releases but in no event will Grigoleit be required to hold as finished goods inventory more than 90 days. If Grigoleit's inventory at any time exceeds 90 days based on Whirlpool's releases, Grigoleit will notify Whirlpool and is then authorized to ship the 90 day inventory to Whirlpool.

(*Id.*) The document also included a three page attachment identifying Whirlpool purchase orders by number, the volume commitment and the price for each part. (*Id.*) The document was signed by Mr. Mark Nelson on behalf of Plaintiff.

On February 26, Mr. Winick emailed Mr. Slade and others at Whirlpool. In the email, Mr. Winick stated Grigoleit

>agree[s] in principle with Whirlpool's proposal received at 6:27 pm CST on February 25, in the context of our phone discussions yesterday. There are some minor things I think need to be cleaned up in the language of the Agreement before signing. For example, I believe your paragraph 4 contains an incomplete sentence. I will call you on Monday before 10:00 CST to discuss these things.
>
>Based on our expectation that we will have a signed Agreement in the next couple of days, Grigoleit will process Whirlpool releases on Monday, February 28, as if the

3

agreement is in force. . . .

(Dkt. No. 88-6, Exhibit 5 to Grigoleit's Response). Later that same day, Mr. Winick again emailed Mr. Slade with the following message: "I've attached a 'commented' copy of the Agreement so you can see the minor things referred to in my previous message. My name, title, and the date at the bottom are to confirm Grigoleit's acceptance effective February 26, 2005." (Dkt. No. 88-7, Exhibit 6 to Grigoleit's Response.) Attached to the email was the two-page Agreement sent to Grigoleit the day before. (*Id.*) On the document, to the right of the text, Grigoleit added six balloons with commentary and dotted lines directing the reader to the place in the text where the comments applied. (*Id.*) The balloon commentary for Paragraph 5 states "per our discussion Friday the $100,000 limitation does not apply to cancellation or obsolescence of quantities that can be supported by either the firm and mutually defined periods on Whirlpool releases or the Attachment A Commitment quantities." (*Id.*) A seventh balloon indicated Grigoleit had deleted the words "effective immediately" from the end of Paragraph 2. (*Id.*)

Mr. Winick, Mr. Slade and Mr. Mark Nelson, also with Whirlpool, discussed the agreement via telephone on February 28. Mr. Winick avers Mr. Slade and Mr. Nelson stated the incomplete sentence in Paragraph four was supposed to be edited to "reflect an authorization for Grigoleit to enter or renew a minimum order quantity once the Whirlpool part volume commitment order balance had been exceeded by the firm quantities on Whirlpool releases." (Dkt. No. 88-15, Exhibit 14 to Defendant's Response - Winick Affidavit ¶ 3.) Mr. Winick further avers Mr. Slade and Mr. Nelson "accepted the 'comments' and requested Grigoleit provide language consistent with the parties' discussions." (*Id.* ¶ 6.) Around 1:00 p.m. that day, Mr. Winick emailed Mr. Slade the following:

> As you and Mark requested, following in blue is wording we would like to have in paragraph 2 and 5 of the Agreement for clarity:

4

>Paragraph 2
>Prices per ATTACHMENT A are immediately effective and are based on immediately increasing the current Grigoleit order balances by the "WHIRLPOOL PART VOLUME COMMITMENT" quantity shown in ATTACHMENT A for each blanket PO. Grigoleit will provide Whirlpool with a copy of Grigoleit's Item/Order Due Listing, showing current order balances in order to establish the baseline quantities to which the "WHIRLPOOL PART VOLUME COMMITMENT" quantities will be added.
>
>Paragraph 5
>Whirlpool is liable for all quantities of finished parts, components, and raw materials that are processed and/or procured by Grigoleit in meeting its obligations under previous and new blanket PO's. Such quantities may exceed the amount required to cover actual quantities of finished parts shown on the Grigoleit order balance at a given time, e.g. minimum buys of raw materials, etc. The total Whirlpool liability for quantities of materials in excess of Grigoleit order balance shall not exceed $100,000 and shall be limited to obligations supported by Grigoleit inventory or other records as follows:
>>a. Finished parts shall be paid by Whirlpool at ATTACHMENT A price.
>>b. In process components shall be paid by Whirlpool at Grigoleit stated percentage of completion of ATTACHMENT A price.
>>c. Raw material, which includes purchased components, committed and on hand shall be paid by Whirlpool at Grigoleit laid-in invoice price plus thirty percent. Grigoleit shall ship any parts, components and raw materials covered under this paragraph as directed by Whirlpool.

(Dkt. No. 88-8, Exhibit 7 to Defendant's Response.)

Mr. Slade responded via email. He expressed concern about the changes to paragraph 2, but expressed no concern about the changes to paragraph 5. He wrote

>We have just reviewed the changes. We are leaving (as defined by the mutually defined period) in paranthesis [sic] in #2. We are concerned with the language because we do not know the "current Grigoleit order balances." If you can provide these balances, or if we can agree to the Attachment A commitments beginning with receipts March 1. We hava [sic] a completed agreement. Please let me know which direction you prefer to take #2.

(*Id.*) Mr. Winick responded to Mr. Slade's email expressing Grigoleit's preference for its phrasing of paragraph 2 "because it's important to have a firm baseline quantity that we've agreed to." (Dkt. No. 88-9, Exhibit 8 to Defendants' Response.) Mr. Winick explained the "mutually defined" period

5

on current Whirlpool releases do not include parts that were in the "mutually defined" period on earlier Whirlpool releases. (*Id.*) Mr. Winick attached Grigoleit's current order due lists to the email. (*Id.*)

On March 1, 2005, Mr. Winick emailed Mr. Slade and Mr. Nelson again expressing concerns about the terms of the agreement. In the opening paragraph of this email, Mr. Winick alleged Mr. Slade stated, in some unknown correspondence, that Whirlpool's offer was no longer valid. (Dkt. No. 90-2, Plaintiff's Reply - Exhibit A to Ramsey Affidavit.) Mr. Winick opined the reason for the statement was the "order balance reconciliation . . . i.e., paragraphs 2 and 4 of the Agreement." (*Id.*) Mr. Winick pledged to "work with Whirlpool to try and resolve any concerns." (*Id.*) In the subsequent paragraphs, Mr. Winick explained why he believed the two parties had an agreement. He stated "Grigoleit accepted Whirlpool's offer by means of my email correspondence to you dated February 26, 2005. This correspondence sent to you included a copy of Grigoleit's accepted unmodified Whirlpool proposal. The Grigoleit correspondence included comments regarding such accepted proposal and was not a counterproposal." (*Id.*) Later in the email, Mr. Winick reiterated "Grigoleit and Whirlpool have a valid agreement based on the Whirlpool February 25, offer and Grigoleit's acceptance of same and the comments discussed early Monday morning February 28. Whirlpool cannot effectively deem its February 25, offer 'invalid.'" (*Id.*)

One aspect of this dispute revolves around calculating Whirlpool's Part Volume Commitment for any particular part. In the same March 1 email, Mr. Winick outlined Grigoleit's understanding of Whirlpool's commitment under the new agreement.

> All recent Grigoleit proposals and discussions regarding [the agreement] have addressed the use of Grigoleit's Due List order balances to eliminate the possible ambiguity of "processing instructions" through identification of "exact and related" Whirlpool blanket purchase order, Grigoleit and Whirlpool part number, order

6

> balance quantity and price. All Grigoleit order balances can be verified through Grigoleit processing to Whirlpool commitments. Grigoleit will be willing to spend reasonable time to work with anyone at Whirlpool to verify the new order balances against Whirlpool Saturday, February 26, 2006, releases plus Attachment A quantities, if Whirlpool desires. Grigoleit processing procedures have been previously reviewed by Whirlpool and validated to Whirlpool's satisfaction.
> ...
> On Monday, February 28, in consideration of our Agreement, Grigoleit processed Whirlpool Saturday, February 26, releases by increasing Grigoleit order balances by the quantities in the "Firm" and "Mutually Defined" Liability Codes of such Whirlpool releases in accord with paragraph 2 of the Agreement. This is less than if we had used the 8 week "firm commitment period" per paragraph 4 of the Agreement. Grigoleit sent a copy of our updated Item/Order Due Listing to Whirlpool after processing Whirlpool February 26, releases.

(*Id.*) Mr. Slade sent a follow up email on March 3 in which he stated Whirlpool "considers both parties to be currently operating under the terms of the contract sent to Grigoleit on February 25, 2005, signed by Mark Nelson. I verbally acknowledged concerns over some ambiguity in the contract that I will respond to in more detail by end of business March 4, 2005." (Dkt. No. 90-2, Plaintiff's Reply - Exhibit B to Ramsey Affidavit.) On March 4, 2005, Mr. Slade did respond to Grigoleit's concerns about the February 25 document. Mr. Slade wrote

> Whirlpool is not willing to accept any amendments to the agreement signed by Whirlpool and faxed to your attention 2/25/05 which Grigoleit subsequently accepted via email dated 2/26/05, confirmed via email 3/1/05 and confirmed once again by beginning to supply per Whirlpool's purchase orders. It is, however, Whirlpool's position that the term "current" as referred to in Paragraph 2 of the agreement, "current Grigoleit order balances" means the "current" order balances existing at Grigoleit on January 31, 2005, which is the same day that Grigoleit notified Whirlpool that all its blanket purchase orders would be and were cancelled.

(Dkt. No. 90-2, Plaintiff's Reply - Exhibit C to Ramsey Affidavit.)

Mr. Winick sent an email to Mr. Slade in May 2005 referencing emails from March and April in which the parties continued to raise concerns about the February 25 document and proposed alternative wordings. (Dkt. No. 88-16, Exhibit 9 to Defendant's Response.) The subject of the

email was how to deal with Whirlpool releases exceeding Grigoleit's order balances. In the email, Mr. Winick wrote, "in reference to negotiations leading up to our completed agreement, being the agreement described in our March 28, 2005 letter, we discussed, but never resolved how to handle such situations." (*Id.*) Whirlpool and Grigoleit agreed, for the purpose of the four parts identified in the email, that Whirlpool would accept another commitment equal to the quantity identified on SCHEDULE A. (*Id.*) Defendant admits, after the exchange of emails in May, Grigoleit "worked directly to the Whirlpool releases in its manufacturing, rather than enter additional minimum order quantities of a part once the volume commitment had been exceeded, and Grigoleit accepted the associated economic burdens of doing so. (Howie dep. At 285-287, 289-293)." (Defendant's Response at 7.)

By November 2005, Whirlpool found new suppliers for the parts supplied by Grigoleit and terminated any agreement with Grigoleit to supply those parts. (Dkt. No. 80-15, Exhibit 13 to Plaintiff's Brief in Support - Beller Affidavit ¶ 6.) On November 28, 2005, Grigoleit notified Whirlpool by email of the inventories of finished goods exceeding 90 days based on Whirlpool releases and indicated it was authorized to ship the goods to Whirlpool. (Dkt. No. 80-3, Exhibit 1 to Plaintiff's Brief in Support.) The next day, Grigoleit emailed a confirmation to Whirlpool of the exact quantities of goods shipped to Whirlpool. (Dkt. No. 80-4, Exhibit 2 to Plaintiff's Brief in Support.) Grigoleit also advised Whirlpool that because there were no remaining quantities on Whirlpool releases, Grigoleit would proceed under paragraph 5 of the agreement to calculate the cost of the remaining quantities of finished parts, in process components, and raw materials, not to exceed $100,000.00. (*Id.*) Mr. Winick avers, on December 23, 2005, he notified Mr. Beller at Whirlpool that Grigoleit had substantially more than $100,000 in finished parts, components and

raw materials and that Whirlpool could reduce its $100,000 liability under paragraph 5 by submitting additional releases. (Winick Affidavit at ¶ 7.)

## II. LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions together with the affidavits show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

## III. ANALYSIS

The dispute in this case revolves around four points of difference: (1) the terms of the current agreement between the parties, (2) the amount of Whirlpool's initial volume commitment under the new agreement, (3) the amount of Whirlpool's remaining volume commitment for certain parts, and (4) whether parts ordered pursuant to a release, but over the volume commitment for that part and

9

shipped to Whirlpool after the agreement was terminated, fall under paragraph 5 of the agreement. Both parties approach the motion on the assumption they have an agreement. The parties generally agree Plaintiff owes Defendant for the amount of parts remaining on Plaintiff's part commitments when Plaintiff terminated the contract.

      A.  Terms of the Agreement

Plaintiff asserts the parties entered into an agreement on February 25, 2008. Defendant argues the February 25 document does not govern the dispute.  Defendant argues its revisions to Paragraph 2 and Paragraph 5 were accepted by Whirlpool on February 28.  For Paragraph 5, Defendant asserts the parties agreed to Grigoleit's February 26 proposed language.  For Paragraph 2, Defendant asserts the following language constitutes the final agreement

> Prices per ATTACHMENT A are immediately effective and are based on immediately increasing the current Grigoleit order balances (as defined by the "mutually defined" period) by the "WHIRLPOOL PART VOLUME COMMITMENT" quantity shown in ATTACHMENT A for each blanket PO. Grigoleit will provide Whirlpool with a copy of Grigoleit's Item/Order Listing showing current order balances in order to establish the baseline quantities to which the "WHIRLPOOL PART VOLUME COMMITMENT" quantities will be added.

(Defendant's Response at 6.)  Furthermore, Defendant insists the incomplete sentence in Paragraph 4 was supposed to be edited to authorize Grigoleit to renew the "Whirlpool Part Volume Commitment" by the volume listed in Attachment A for each specific part number after the Part Volume Commitment was reached.  (Dkt. No. 88-16, Defendant's Response Deposition Cites - Howie Deposition at 294, 295.)

There is no genuine issue of material fact that the parties have an agreement.  The existence and interpretation of a contract are a matter of law.  *Indus. Equip. Co. v. Emerson Elec.* Co., 554 F.2d 276, 284 (6th Cir. 1977); *Bandit Indus., Inc. v. Hobbs Int'l, Inc.*, 463 Mich. 504, 511, 602

N.W.2d 531 (2001). The parties' dispute when an agreement was reached, as the parties attempted to negotiate the terms of the agreement. Michigan Commercial Code section 440.2207 governs acceptance when additional or different terms from the offer are used in the acceptance. Section 440.2207 provides

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>     (a) the offer expressly limits acceptance to the terms of the offer;
>     (b) they materially alter it; or
>     (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

MCL § 440.2207. The February 25, 2008 fax from Whirlpool to Grigoleit was an offer. The February 26, 2006 emails from Mr. Winick to Mr. Slade constitute an acceptance of the offer under section 440.2207(1), even though the second email, the "commented version" of the agreement, contained additional and different terms. Nothing in either February 26 email from Mr. Winick to Mr. Slade suggests Grigoleit's acceptance was conditioned on assent to the addition or different terms contained on the signed "commented version" of the agreement. *See Challenge Machinery Co. v. Mattison Machinery Works*, 138 Mich. App. 15, 22, 359 N.W. 2d 232, 235 (Mich. App. 1984) ("the conditional assent provision of the commercial code has been narrowly construed to require the acceptance must clearly reveal that the offeree is unwilling to proceed unless assured of the offeror's assent to the additional or different terms.")

Whirlpool's February 25 offer constitutes the terms of the agreement between the two parties. Under Section 440.2207(2) of Michigan's Commercial Code, the additional and different

11

terms contained in Grigoleit's acceptance become part of the agreement between the parties, unless any of three conditions occur. Mr. Slade's March 4, 2005 email to Mr. Winick clearly constitutes a notification of objections to the additional or different terms by the offeror to the offeree, one of the three conditions which would prevent the additional or different terms from becoming part of the agreement. MCL § 440.2207(2)(c). In addition, Whirlpool did not explicitly agree to any of the proposed changes between February 26 and March 4. Because the parties exchanged multiple telephone calls and emails attempting to clean up the language of the February 25 fax, each paragraph will be considered separately.

With regard to Paragraph 2, Grigoleit emailed Whirlpool on February 28 with a draft of a new version of Paragraph 2 which incorporated Grigoleit's February 26 commentary. Whirlpool rejected Grigoleit's proposed language and wanted to leave the phrase "as defined by the mutually defined period" in parentheses. Whirlpool objected to the draft because the proposed language did not clarify what the order balances were for each part. Whirlpool then proposed that Grigoleit either provide the order balances or the two parties could agree to the part commitments that would take effect on March 1. Grigoleit's response included an attachment listing the current order balances. However, the response also expressed a preference for the language in its proposed draft. Accordingly, the parties never reached an agreement to alter the wording of Paragraph 2 and the March 4 email expressly objected to the proposed alterations that were being negotiated. Grigoleit's assertion that the parties had, in Whirlpool's words, "a completed agreement" because Grigoleit attached its order balances ignores the unresolved disputes regarding the language in this and other paragraphs.

Paragraph 4 of the February 25 fax contained an incomplete sentence. Grigoleit pointed this

out in their February 26 acceptance. Grigoleit alleges Whirlpool orally agreed on February 28 that the intent of the incomplete sentence was to allow Grigoleit to enter a minimum order quantity once Whirlpool meet or exceeded its order commitment on its releases. The parties never exchanged any drafts proposing an alteration of the initial version of Paragraph 4. The March 4 email served as a notice of objection to any alteration of Paragraph 4. In addition, the parties' subsequent conduct does not reflect that they ever agreed to alter the language of Paragraph 4 to reflect Grigoleit's allegation. In May 2005, Mr. Winick wrote Whirlpool, stating the two parties never resolved how to handle situations involving Whirlpool releases that exceeded Grigoleit's order balances. Whirlpool agreed to accept another commitment equal to the amount identified on Schedule A for only four parts. Because of the ambiguity in the agreement and difficulty getting answers from Whirlpool, Grigoleit did not assume Whirlpool would agree to accept another commitment equal to the amount identified on Schedule A for other parts once the order balance had been exceeded.

Grigoleit's February 26 version of Paragraph 5 contained only minor edits of Whirlpool's February 25 version of paragraph 5. Whirlpool did not discuss Paragraph 5 in the emails exchanged between February 26 and March 4. On March 4, Whirlpool objected to any changes in the February 25 draft. That notice of objection was given within a reasonable amount of time after receiving the additional or different terms.

   B. Initial Volume Commitments

There are genuine issues of material fact as to what Whirlpool's volume commitments were for four parts under the Agreement. Mr. Beller, with Whirlpool, prepared a spreadsheet identifying Whirlpool's volume commitment under the Agreement and the remaining volume commitment

13

value.[2]  (Dkt. No. 80-15, Brief in Support - Exhibit A to Beller Affidavit.)  In response, Grigoleit relies on a spreadsheet prepared by Mr. Winick showing, among other things, the volume commitments on Mr. Beller's spreadsheet and Grigoleit's Item/Order Due List as of March 1, 2008. (Dkt. No. 88-13, Brief in Response - Exhibit 12.)  Grigoleit notes the two parties "agree regarding the beginning volume commitments, . . ., being the same excepting as to four part numbers, specifically 3950759, 3406133, 3951026, and 8271339.  (Brief in Response at 11.)

    C.  Remaining Volume Commitments

There are genuine issues of material fact regarding Whirlpool's volume commitments remaining after Whirlpool terminated the contract with Grigoleit.  Neither of the spreadsheets prepared by Mr. Beller establishes how he calculated Whirlpool's remaining volume commitment value.  Presumably, Mr. Beller multiplied Whirlpool's remaining volume commitment by the price for each part under the Agreement, but neither spreadsheet reflects the number of parts remaining on Whirlpool's volume commitment.  In the affidavit attached to Whirlpool's brief in support, Mr. Beller does not explain how he determined what Whirlpool's remaining volume commitments were. The spreadsheet prepared by Mr. Winick includes a column identifying the quantity of parts shipped by Grigoleit to Whirlpool between February 28, 2005 and November 27, 2005.  (Brief in Response - Exhibit 12.  *See also* Dkt. No. 88-14, Brief in Response - Exhibit 13.)

In its reply, Whirlpool states there are two problems with Grigoleit's calculation of the

---

[2]Mr. Beller initially calculated the value of Whirlpool's remaining commitment as $93,265.00.  Mr. Beller corrected an omission in a spreadsheet to attached Whirlpool's reply brief, increasing the value of its remaining commitment to $94,069.41.  (Dkt. No. 90-3, Reply Brief - Exhibit A to Beller Affidavit.)

remaining volume commitment for four parts.[3]  First, Whirlpool asserts Grigoleit has not correctly calculated the quantity of parts shipped for four parts that have more than one blanket purchase order ("double purchase order parts").[4]  Whirlpool states double order parts have two purchase order numbers, one for each of two Whirlpool manufacturing locations.  Whirlpool argues, for four of the double purchase order parts, the total quantity of parts shipped exceeds the sum of the volume commitment on the two purchase orders.  Whirlpool admits the parts shipped to one plant exceeded the volume commitment for one of the two purchase orders and that the parts shipped to the second plant did not meet the volume commitment for the second plant.  Whirlpool concludes it has met its volume commitment because the total number of parts purchased exceeds the sum total of the volume parts commitment when the quantities listed on the two purchase orders are combined.

The proper interpretation of a contract is a question of law.  *Royal Ins. Co. of America v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008) (citing *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2008) (applying Michigan law)).

"If a contract is clear and unambiguous . . . there is no issue of fact to be

---

[3] Whirlpool alleges this problem involves four parts: (1) 3950759/425202, (2) 3951026/435425, (3) 3950762/435502, and (4) 8274378/439901.  The seven digit number is Whirlpool's part number and the six digit number after the "/" is Grigoleit's corresponding part number for the same part.

[4] The phrase "double purchase order parts" is the Court's phrase, not the parties' phrase.  Double purchase order parts refer to those parts listed on Schedule A with more than one purchase order number, but the same Whirlpool part number and Grigoleit part number.  For example, the first two lines on Schedule A have purchase order numbers of 3205331 and 4205331.  The Whirlpool part number for both purchase orders is 3950757 and the Grigoleit part number for both purchase orders is 435201.  On Schedule A, Whirlpool made a one time part volume commitment for purchase order 3205331 for 1000 parts.  Whirlpool's volume commitment for purchase order 4205331 on Schedule A is zero.  There are more than four double order parts on Schedule A, however, Whirlpool has asserted this problem only with regard to these four double order parts.

> determined." In such instances, a court should not use extrinsic evidence to "attempt to discern the intent of the parties," but rather should determine their intent from "the plain language of the contract." "The question of whether the language of an agreement is ambiguous is a question of law." Ambiguity exists "if the language is susceptible to two or more reasonable interpretations." "In making such a determination, a district court is counseled to read the contract as a whole, and to give the contract language its ordinary and natural meaning." The above principle of contract interpretation establish that ordinary judges interpret the language of contracts as a matter of law.

*Id.* (alterations in original) (citations omitted). However, when the contract contains ambiguities, the fact finder must rely on extrinsic evidence to determine the intent of the parties. *Id.* In such case, the jury must determine the meaning of the contractual terms, using the proper instructions. *Id.* (quoting *Scott v. Anchor Motor Freight, Inc.*, 496 F.2d 276, 280 (6th Cir. 1974).

Whirlpool's interpretation of the Agreement is not supported by the language of the Agreement. The February 25 Agreement, drafted by Whirlpool, increased Whirlpool's part volume commitment by the quantity shown on Attachment A. Schedule A identifies distinct purchase orders and lists volume commitments for parts pursuant to each distinct purchase order. Nothing in the Agreement, or on Schedule A, suggests the volume commitments listed on each separate and distinct purchase order could be combined, even when the part was the same. Whirlpool's interpretation of its commitments under Schedule A ignores the commitment it made to purchase parts pursuant to those distinct purchase orders. To avoid this situation, Whirlpool could have easily drafted the Agreement to reflect its current interpretation of the Agreement. Whirlpool could also have opted to draft its releases to distribute the parts between the two manufacturing plants to assure the volume commitment on each purchase order would be met.

Second, Whirlpool states Grigoleit has not credited Whirlpool with all of the parts shipped by Grigoleit and received by Whirlpool. Whirlpool alleges this problem exists for some 20 parts

16

listed on Schedule A. Mr. Beller prepared yet another spreadsheet in an attempt to show the quantities received by Whirlpool for each of the twenty parts. (Dkt. No. 90-3, Brief in Reply - Exhibit B to Beller Affidavit.) On this spreadsheet, Mr. Beller lists Whirlpool's part number, the date a shipment of that part was received, the receipt number, and the quantity received.

The documentary evidence offered by both sides on the issue of Whirlpool's remaining volume commitments is inconclusive and consequently there is a genuine issue of material fact. Neither side has submitted any of the original paperwork, instead both rely on affidavits and spreadsheets. For the purpose of the motion, the Court must accept Mr. Winick's numbers over Mr. Beller's numbers as Grigoleit is the non-moving party.

D. Parts Shipped by Grigoleit to Whirlpool Over Whirlpool's Volume Parts Commitment

Whirlpool asserts, in October and November 2005, Grigoleit shipped finished parts to Whirlpool under Paragraph 6 of the Agreement. Whirlpool asserts its obligation to pay for those finished parts is outlined under Paragraph 5 of the Agreement and has a cap of $100,000.00. Whirlpool argues the cap is designed to limit its liability to Grigoleit for finished parts, in-process components and raw materials after Whirlpool's volume commitments have been met. Whirlpool concludes its liability is limited to the remaining part volume commitment when the Agreement was terminated and up to $100,000.00 for the finished parts, in-process components and raw materials Grigoleit can prove under Paragraph 5.

Grigoleit disputes Whirlpool's understanding of its obligation to purchase finished parts under paragraph 2 of the Agreement. Grigoleit argues that once Whirlpool issues a release for parts, it is obligated to purchase those finished parts, even if those parts exceeded Whirlpool's volume part commitment for that particular part. Grigoleit finds support for its interpretation of the Agreement

17

under Paragraph 5. Paragraph 5 obligates Whirlpool to pay, up to $100,000.00 for materials secured and parts manufactured by Grigoleit in meeting its obligations under blanket purchase orders. The second sentence of Paragraph 5, according to Grigoleit, distinguishes finished parts manufactured in anticipation of future releases from finished parts manufactured pursuant to a Whirlpool release.

Defendant states "under paragraph 5 of the Agreement, the $100,000.00 limitation applied to quantities above and beyond what was a 'firm' order. (Winick dep. At 38)." (Defendant's Response at 8.) Defendant asserts all of the parts shipped to Whirlpool on November 28 were ordered by Whirlpool. Defendant argues the parts shipped fall into one of three categories:

> (1) the remaining firm to manufacture quantities from the 3/1/05 Grigoleit Item/Order Due Listing order balances;
> (2) remaining firm to manufacture quantities generated by Grigoleit processing of a Whirlpool release in accordance with the eight full weeks firm commitment period per the February, 2005 Agreement, Paragraph 4, and otherwise in accordance with the Whirlpool purchase order terms; or
> (3) firm commitment quantities resulting from Grigoleit shipping in multiples of Whirlpool FPA (first piece approval) approved carton quantity of a part in conformance with the FPA approved control plans to properly protect the parts.

(Defendant's Response at 8.) Defendant explains, under the prior agreement, the firm period was two weeks and the next six weeks were considered "mutually defined." Defendant reasons, pursuant to the incomplete sentence in paragraph 4, the firm period for part fabrication was extended to eight weeks.

The Agreement does not support Whirlpool's interpretation of its obligations to pay for finished parts. Paragraph 2 sets the price for each part and establishes Whirlpool's volume commitment for each part. Paragraph 5 operates to protect Grigoleit when it acts under a blanket purchase order in anticipation of future orders by Whirlpool. The second sentence distinguishes the materials subject to the $100,000.00 cap from finished parts shown on Grigoleit's order balance.

18

Unfortunately, the Agreement neither defines "Grigoleit order balance" nor specifies how Grigoleit must calculate its order balance. It is not clear from the record how Grigoleit calculates its order balance. Furthermore, Grigoleit's order balance, as of November 27, 2008, has not been provided for the record.

Reading the Agreement in its entirety, Whirlpool is obligated to pay for parts for which there is a firm commitment on a release. Paragraph 2 of the Agreement establishes the price and volume commitment for each part. The portions of Paragraph 4 which are coherent clarify that Grigoleit will process Whirlpool releases weekly and will provide Whirlpool with copies of the Item/Order Due List including the order balances for each part and the scheduled shipping date for those parts. Paragraph 4 thus provides a mechanism for Grigoleit to inform Whirlpool of what parts it is manufacturing pursuant to a release and when those parts would be shipped. Paragraph 5 identifies Whirlpool's obligation to reimburse Grigoleit for raw materials secured and parts manufactured in anticipation of future releases, but caps the obligation at $100,000.00. Paragraph 5 does not apply to parts manufactured pursuant to a release.

IV. CONCLUSION

For the reasons provided above, Plaintiff Whirlpool's motion (Dkt. No. 79) for partial summary judgment is **GRANTED IN PART and DENIED IN PART.** The February 25, 2005 offer sent by Whirlpool to Grigoleit was accepted by Grigoleit and constitutes the terms of the Agreement between the two parties. There remains a genuine issue of material fact as to Whirlpool's initial volume commitment with regard to the four parts identified by Grigoleit. There remains a genuine issue of material fact as to Whirlpool's remaining volume commitments on a number of parts. Each purchase order constitutes a distinct volume commitment and Whirlpool

19

cannot use parts ordered pursuant to one purchase order to count toward its obligation under a different purchase order.  Finally, finished parts manufactured pursuant to a release and identified on Grigoleit's order balance do not fall under the liability cap located under Paragraph 5 of the Agreement.  **IT IS SO ORDERED.**

Date:   December 11, 2008            /s/ Paul L. Maloney            
                                        Paul L. Maloney
                                        Chief United States District Judge