UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WHIRLPOOL CORPORATION,

    Plaintiff/Counter-Defendant          Case No: 1:06-cv-0195

v.                                                  HONORABLE PAUL L. MALONEY
                                                  Chief United States District Judge

THE GRIGOLEIT COMPANY,

    Defendant/Counter-Plaintiff
_____/


**OPINION OF THE COURT CONTAINING FINDINGS OF FACT
AND CONCLUSIONS OF LAW AFTER BENCH TRIAL**


**INTRODUCTION**

This lawsuit arises from a dispute between Plaintiff/Counter-Defendant, Whirlpool Corporation, (hereinafter "Whirlpool"), and Defendant/Counter-Plaintiff, The Grigoleit Company, (hereinafter "Grigoleit"). Grigoleit supplied Whirlpool with knobs, a customer "touch point," for Whirlpool's top-load washers and dryers, manufactured in Clyde and Marion, Ohio. Trial Tr. vol. I, 55, Dec. 15, 2008, ECF No. 110. Whirlpool is an international corporation based in Benton Harbor, Michigan. Second Am. Compl. 2, ECF No. 37. Grigoleit resides in Decatur, Illinois with an affiliate, Mid-South Tool located in Hartsell, Alabama.

This Court has unquestioned diversity jurisdiction pursuant to 28 U.S.C. § 1332 (2006).

The Court heard proofs over multiple days of testimony. The principal witnesses in this litigation are: Mr. Timothy Slade (Slade), Fabric Care Buyer for Whirlpool, Mr. Todd Beller (Beller), Fabric Care Supply Base Manager, Mr. Joel Winick (Winick), Sales Manager for Grigoleit, Mr. Robert Howie (Howie), President and General Manager of Grigoleit, Mr. Dean Ortinau (Ortinau), Controller of Grigoleit, and Mr. Rodney Crawford (Crawford), Expert Witness Accountant who testified on behalf of Whirlpool.

After several years of mutually beneficial, relatively uneventful business relations, on November 4, 2004, Grigoleit notified Whirlpool of price increases on six parts. Pl.'s Trial Ex. 2. Winnick, Sales Manager for Grigoleit, expanded the parts list increases shortly thereafter to sixty. Pl.'s Trial Ex. 3. Grigoleit was the sole supplier of these parts to Whirlpool. Trial Tr. vol. I, IV,

55–56, 198, 713, Dec. 15, 2008, Jan. 7 2009, ECF No. 110, 113.  With gap periods which the Court ultimately finds significant, communication occurred between the parties, culminating in an agreement in early February 2005.  Pl.'s Trial Ex. 1.

The parties operated under the "agreement" until late 2005 at which time, Whirlpool secured other suppliers for the parts.  Trial Tr. vol. I, 207, 201, 212–14, ECF No. 110.  Whirlpool asserts it paid in excess of $1.3 million due to the price increases demanded by Grigoleit above the price that alternative suppliers, eventually substituted, charged Whirlpool.  Grigoleit demands it be paid for parts delivered and additional amounts pursuant to the agreement.

Whirlpool has interposed a defense of unconscionability under Michigan law.   Grigoleit denies that any of its actions were unconscionable and seeks payment pursuant to the agreement.

**Application of Michigan Law to the Dispute**

**The parties concur that Michigan law guides the determination of its dispute.**

**Michigan Law of unconscionability**

The unconscionability provision of the Michigan Commercial Code, Mich. Comp. Laws § 440.2302 (2009), mirrors the unconscionability provision of the U.C.C. § 2-302 (2003).

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

Mich. Comp. Laws § 440.2302 (2009).

Accordingly, the Court must focus on the contested parts of the agreement and determine under the evidence presented at trial whether all, some or none of the constituent parts meets the test for unconscionability under Michigan law.

Under Michigan law, a contract or one of its provisions will be considered unconscionable only where both procedural and substantive unconscionability are present.  *Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471, 474 (Mich. Ct. App. 2005) (citing *Nw. Acceptance Corp. v. Almont Gravel, Inc.*, 412 N.W.2d 719, 723 (Mich. Ct. App. 1987)); *see also Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 322 (6th Cir. 1998) (summarizing Michigan law on unconscionability).  In *Allen v. Mich. Bell Tel.*, 171 N.W.2d 689 (Mich. Ct. App. 1969), the

Court described the inquiry as follows: "1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are the options?; and 2) Is the challenged term substantively reasonable?" *Id.* at 692.

The party alleging a contract or clause is unconscionable must demonstrate "'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Pichey v. Ameritech Interative Media Servs., Inc.*, 421 F.Supp.2d 1038, 1045 (W.D. Mich. 2006) (quoting *Nw. Acceptance Corp.*, 412 N.W.2d at 723). *See Coursey v. Caterpillar, Inc.*, 64 F.3d 662, No. 94–1348, 1995 WL 492923 at *3 (6th Cir. Aug. 16, 1995) (Table) (per curiam) (placing the burden on the buyer to prove unconscionability and citing James J. White & Robert S. Summers, *Uniform Commercial Code*, 1, § 12-11 at 607 (West Publishing Co. 3d ed. 1991)). Under Michigan law, whether a contract or clause is unconscionable is a question for the court to decide as a matter of law. *Andersons*, 166 F.3d at 323 (citing *Citizens Ins. Co. of Am. v. Proctor & Schwartz*, 802 F.Supp. 133, 143 (W.D. Mich. 1992) (citing *Nw. Acceptance Corp.*, 412 N.W.2d at 722)). Unconscionability is determined by the facts and circumstances at the time the contract was formed and not the facts and circumstances at the time the suit was filed. *Id.*

## I.  PROCEDURAL UNCONSCIONABILITY CASES

When considering the first prong, procedural unconscionability, the Court examines "the relative bargaining power between the parties, their relative economic strength, [and] the alternative sources of supply . . . ." *Nw. Acceptance Corp.*, 412 N.W.2d at 723. Procedural unconscionability arises when the weaker party to an agreement has little or no bargaining power and no realistic alternative but to accept the terms of the agreement. *Clark*, 706 N.W.2d at 474–475 (citing *Allen*, 171 N.W.2d at 692). When the weaker party was free to accept or reject the term, no procedural unconscionability exits. *Id.* at 475. Almost forty years ago the Michigan Court of Appeals explained the circumstances under which a party might not have any realistic alternatives:

> Implicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered. Where goods and services can only be obtained from one source (or several sources on non-competitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without. Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the courts enforcing it on the ground that it was "freely" entered into, when it was not. He cannot in the name of freedom of contact be heard to insist on enforcement of an unreasonable contract term against one who on any fair appraisal was not free to accept or reject that term.

*Allen*, 171 N.W.2d at 692.  After examining several different opinions discussing procedural unconscionability, the Sixth Circuit Court of Appeals concluded "the most important factors in determining procedural unconscionability are (1) whether the relatively weaker party had an alternative source with which it could contract, and (2) whether the contract term in question was in fact negotiable."  *Andersons*, 166 F.3d at 324.

## II. SUBSTANTIVE UNCONSCIONABILITY

Substantive unconscionability arises when the terms of the agreement are "not substantively reasonable."  *Clark*, 706 N.W.2d at 475.  "Reasonableness is the primary consideration."  *Hubscher & Son, Inc. v. Storey*, 578 N.W.2d 701, 703 (Mich. Ct. App. 1998) (citing *Stenke v. Masland Dev. Co. Inc.*, 394 N.W.2d 418, 424 (Mich. Ct. App. 1986)); *Gianni Sport Ltd. v. Gantos, Inc.*, 391 N.W.2d 760, 762 (Mich. Ct. App. 1986)).  "[A] term is substantively unreasonable [where] the inequity of the term is so extreme as to shock the conscience."  *Clark*, 706 N.W.2d at 475.  However, substantive unconscionability does not exist "simply because it is foolish for one party and very advantageous to the other."  *Id.* (citing *Gillam v. Mich. Mortg.-Invt. Corp.*, 194 N.W. 981, 982 (Mich. 1923)).  "'The commercial setting, purpose, and effect of the contractual provision determines whether that provision is substantively unreasonable or unconscionable.'"  *Nw. Acceptance Corp.*, 412 N.W.2d at 722 (citing *Reed v. Kaydon Eng'g Corp.*, 196 N.W.2d 487, 488–89 (Mich. Ct. App. 1972)).

An early, and often quoted, Sixth Circuit case on appeal from the Eastern District of Michigan interpreted a contract which provided that the law of Pennsylvania governed the agreement and the court noted that unconscionability is rarely found in commercial settings.[1]  *U.S. Fibres*, 509 F.2d at 1045, 1048 (citing cases from outside the state of Michigan).  Several federal district courts interpreting Michigan law have noted the same, all citing *U.S. Fibres*.  *Pichey*, 421 F.Supp.2d at 1045 (citing *U.S. Fibres*); *Coursey*, 1995 WL 492923 at *3 (citing *U.S. Fibres*); *Citizens Ins. Co.*, 802 F.Supp. at 143, *overruled on other grounds by Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236 (6th Cir. 1994) (citing *U.S. Fibres* and others); *WXON-TV v. A.C. Nielson Co.*, 740 F.Supp. 1261, 1264 (E.D. Mich. 1990) (citing *U.S. Fibres*); *see also Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.,* 401 F.3d 701, 716 (6th Cir. 2005) (Clay, J., concurring in part and dissenting in part), *abrogated on other grounds by Hall St. Assocs. LLC v. Mattel, Inc.,* 552 U.S. 576 (2008) (citing *Citizens Ins. Co.*, *U.S. Fibres,* and *WXON-TV*).  *But see Johnson v. Mobil Oil Corp.*, 415 F.Supp. 264, 266 (W.D. Mich. 1976) (citing J. White & R. Summers, *Uniform Commercial Code*, § 12-11 at 385–386 (1972)).  The only Michigan court opinion making the same statement of law is unpublished and cites, as authority, a Western District of Michigan opinion.  *See Coding Prods., Inc. v. Hale Co. of Lower Mich., Inc.*, No.

---

[1] Furthermore, the court's comment was dicta.  The circuit court affirmed the district court's decision which "render[ed] extended discussion of the clauses which limited damages under the contracts unnecessary."  *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 509 F.2d 1043, 1048 (6th Cir. 1975).  The court went on to state that the UCC permits limiting consequential damages so long as it is not unconscionable.  *Id.*

200406, 1998 WL 1997647, at *4 (Mich. Ct. App. Feb. 27, 1998) (per curiam) (citing *Citizens Ins. Co.*). Michigan case law applying the doctrine of unconscionability in the context of "a contract between merchants is 'sparse.'" *See Gianni Sport Ltd.*, 391 N.W.2d at 761.

### Findings of Fact and Conclusions of Law

### Whirlpool's Claim of Substantive Unconscionability

As aforesaid, Whirlpool bears the burden of proof on its claim of substantive unconscionability. On this prong of the two-part test, Whirlpool has clearly met its burden. The Court credits the testimony of Crawford, Whirlpool's accounting expert, who testified without persuasive contradiction that Grigoleit was making a profit on its business with Whirlpool prior to November 2004. Trial Tr. vol. II, 317, Dec. 16, 2008, ECF No. 111. Grigoleit unconvincingly argues that Crawford's testimony on the profit margin of Whirlpool's business was inaccurate. Crawford also cast doubt of Grigoleit's justification for the price increase, that is decreasing volume of parts ordered by Whirlpool. *Id.* at 336–337, 395–96. Specifically, Crawford testified that based on his analysis, the reduction in volume did not increase costs for Grigoleit. Defendant did not successfully rebut Crawford's opinion. Accordingly, the Court concludes that Grigoleit was certainly not losing money on the Whirlpool agreement prior to November 4, 2004. Indeed, the evidence preponderates that it was making a profit. Therefore, the factual predicate for Grigoleit's first approach to Whirlpool (i.e. "we are losing money") is not accepted as true by the Court.

Concerning the size of the price increases, Grigoleit relies largely on the testimony of Howie, its President, for justification. After full consideration of Howie's testimony, it is clear to the Court that he decided on the price increase numbers by a "seat of the pants" analysis which the Court finds totally lacking in credibility. In short, Howie made up the prices on his asserted innate sense of what his company needed for some unarticulated reason not shared with the Court and his experience in the business. Howie admitted he brought no formula for determining prices. He essentially hands the Court an *ipse dixit* statement concerning the price increases. Certainly, the company had no persuasive cost data to offer the Court. Stunningly (in light of the testimony of his associates), Howie also admitted that he had no notion of whether, even at the reduced volumes, Grigoleit was making money on the Whirlpool parts. Trial Tr. vol. IV, 666, 850–851, ECF No. 113. This, of course, was Crawford's point precisely. To further buttress Whirlpool's contention, the Court also takes note that the increased income received by Grigoleit from the "agreement" in Exhibit 1 almost exclusively ended up in personal compensation to Howie. *Id.* at 881–82; Pl.'s Trial Ex. 49. The Court also notes that Whirlpool acquired suitable replacement parts from other suppliers after termination of the February 2005 agreement for approximately one million dollars less. *See* Trial Tr. vol. II, 230, ECF No. 111.

Crawford also testified credibly about the price increases. Grigoleit admits that the increases were 172% overall. *See* Def.'s Corr. Post-Trial Br. & Proposed Findings, ¶ 56 n.1, ECF No. 121–2. Further, Crawford testified that Whirlpool's contribution to Grigoleit's profits was 77%. In short, Whirlpool has shown beyond a reasonable doubt that the prices for parts in Exhibit 1

were substantively unconscionable, moored to nothing other than Howie's unsourced estimates as opposed to actual cost and labor data. The Court finds that the price increases shock the conscience.

**Procedural Unconscionability**

Whirlpool argues that excessive price alone may render a contract unconscionable. The parties have not provided any Michigan or Sixth Circuit cases on this direct proposition of law, and the Court has not been unable to locate any.[2] Plaintiff Whirlpool cites four cases arising in the 1960s which support the conclusion that an excessive price may render a contract unconscionable. *See Toker v. Westerman*, 274 A.2d 78 (N.J. Dist. Ct. 1970); *Jones v. Star Credit Corp.*, 298 N.Y.S.2d 264 (N.Y. Sup. Ct. 1969); *Frostifresh Corp. v. Reynoso*, 274 N.Y.S.2d 757 (N.Y. Dist. Ct. 1966), *rev'd*, 281 N.Y.S.2d 964 (N.Y. App. Term 1967); *Am. Home Improvement, Inc. v. MacIver*, 201 A.2d 886 (N.H. 1964). All four cases cited by Plaintiff involved private consumer buyers rather than corporate buyers and all four cases involved some sort of credit charge or payment over time interest. Three of the cases involved the sale of a refrigerator/freezer where the cash price offered to the seller was more than double the cost of the product to the seller. *See Toker*, 274 A.2d at 79; *Jones*, 298 N.Y.S.2d at 266; *Frostifresh*, 274 N.Y.S.2d at 758-759. In *American Home Improvement*, the combination of the interest charged and the commission paid by the buyer was almost double the cash price of the goods purchased. The Court does not find these consumer cases apt for guidance in this case involving mutually sophisticated business parties.

Defendant Grigoleit cites several cases for the proposition that an excessive price, standing alone, will not render a contract unconscionable. *In re Pyramid Energy, Ltd.*, 160 B.R. 586 (Bankr. S.D. Ill. 1993); *Bennett v. Behring Corp.*, 466 F.Supp. 689 (S.D. Fla. 1979); *Contract Buyers League v. F & F Inv.*, 300 F.Supp. 210 (N.D. Ill. 1969). *Bennett* was a class action suit brought by home owners against a developer and many others. In a ruling based on Florida's common law,[3] the court held price alone is insufficient to establish unconscionability and "[a]t most, such proof serves only to establish 'substantive unconscionability.'" *Bennett*, 466 F.Supp. at 696. *Contract Buyers League* was a class action suit brought by black plaintiffs alleging the sales terms in residential housing contracts included higher prices and more burdensome obligations than similar sales to white buyers. Based on Illinois law, the court held a concurrence of many factors was necessary for a finding of unconscionability. *Contract Buyers League*, 300 F.Supp.

---

[2]The few Michigan cases located regarding unconscionably high prices arise under the Michigan Consumer Protection Act, not under the Michigan Commercial Code.

[3]In this part of the lengthy and complex litigation, plaintiffs alleged certain deed restrictions which forced them, as homeowners, to lease recreational facilities, were unconscionable. The court first found Florida's Commercial Code inapplicable as it governed only sales of goods. *Bennett*, 466 F.Supp. at 695. Second, the court held the statute did not codify the common law concept of unconscionability. *Id.* at 695-696. As a result, the claim was analyzed under Florida common law, but the court referenced the UCC as a helpful guide.

at 227.  The court noted, "the general rule" was that an excessive price was not, by itself, sufficient to support a claim of unconscionability.  *Id.*

The opinion in *Pyramid* addressed Pyramid's motion to dismiss its Chapter 7 bankruptcy case.  In order to resolve the motion, the parties first had to resolve a claim between Pyramid and a third party, Heyl & Patterson, Inc., who alleged Pyramid owed it $243,000 under a contract for sale of a coal processing plant; Pyramid alleged the debt was unconscionable on the basis that it paid $50,000 toward the contract and the plant was sold for $45,000 after foreclosure.  *Pyramid*, 160 B.R. at 593.  Pyramid argued the foreclosure sale price established the value of the coal plant.  *Id.*  The court rejected the argument, holding "[i]n a commercial transaction, price alone is insufficient to render a contract unconscionable, as it is inappropriate for the court to substitute its judgment for that of a buyer and seller in a free market."  *Id.* at 594 (citing *In re Colin*, 136 B.R. 856, 858 (Bankr. D. Or. 1991)).  Obviously, none of the cases cited by Defendant interpret Michigan law.

Some guidance can be gleaned from *Allen*, 171 N.W.2d at 692, "[b]y like token, if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties."  Applying Michigan law, Judge Feikens in *Johnson*, stated, quoting J. White & R. Summers, "[m]ost courts take a 'balancing approach' to the unconscionability question, and to tip the scales in favor of unconscionability, <u>most courts seem to require a certain quantum of procedural plus a certain quantum of substantive unconscionability</u>."  *Johnson*, 415 F.Supp. at 268 (cited in *Citizens Ins. Co.* 802 F. Supp at 144 (emphasis supplied)).

Accordingly, in the absence of direct Michigan authority on the question of whether price alone may constitute unconscionability and with the guidance from *Allen*, *Johnson*, and *Citizens Ins.*, the Court concludes that price alone is not enough for Whirlpool to meet its burden.  Whirlpool must show some quantum of procedural unconscionability in addition to the Court's determination that the prices in the "agreement" shocked the conscience.  In other words, for Whirlpool to prevail in whole or in part, the proofs must merge at some point on both prongs of the unconscionability test in the history of the formulation of this agreement.

**Procedural Unconscionability Applied In This Case**

Synthesis of Michigan law of procedural unconscionability boils down to this question: Did Whirlpool have any meaningful choice other than to agree to the contract at issue in this case?  *See Clark*, 706 N.W.2d at 47.  *Andersons* teaches that the two most important factors in procedural unconscionability are whether the relatively weaker party had an alternative source and whether the contract terms were negotiable.  *Andersons*, 166 F.3d at 324.  Whirlpool is a major international corporation in the appliance market worldwide.  Defendant is a family-owned business.

By any measure, it is hard to posit the notion that Whirlpool is the "weaker party"in this case on November 4, 2004.  Yet, Whirlpool argues that indeed they are the weaker party largely because

Grigoleit was the sole supplier of the subject parts, Trial Tr. vol. I, IV, 55–56, 713, ECF No. 110, 113, switching suppliers takes at least six months, Trial Tr. vol. I, 75, 209, ECF No. 110, especially when customer "touch point" parts such as washing machine knobs are involved. Re-flooring of product would also be necessary if a "touch point" part was replaced. *Id.* at 202. In addition, Whirlpool, as a wise business practice, utilized "just-in-time" ordering of parts to save warehouse space and any interruption of the flow of parts would cause shutdown of its manufacturing lines at the two Ohio plants. Shutdown was intolerable for Whirlpool. *See id.* at 57–58.

For valid business reasons as outlined exhaustively in this record, Whirlpool made a conscious business decision to utilize a sole supplier for the subject parts. *See id.* at 54, 56–57. The company saved money among other benefits. The flip side of a sole supplier arrangement is exposure to supply interruption from that entity. Having decided to sole source the parts, Whirlpool cannot now complain from a procedural unconscionability standpoint that at least initially it was the weaker party on that basis. The risk of utilizing sole suppliers redounded to Whirlpool's detriment. The Court rejects Whirlpool's contention that the sole supplier relationship standing alone made it the weaker party. **In essence, Whirlpool asserts that time lines were tight in the manufacturing process. Interruption of parts supply causing shutdown of assembly lines was unacceptable. Defendant knew of its sole source status and blatantly (and illegally) took advantage.** From November 4, 2004 to January 31, 2005, Whirlpool had options to navigate its relationship with Grigoleit. It simply chose not to exercise them in a timely fashion. Unfortunately for Whirlpool, the manner in which its representatives handled the negotiations with Grigoleit in the critical time from between November 4, 2004 and January 31, 2005, undermines its posture as the "weaker party." It had the option to pursue alternative sources. It did not do so.

The communication dynamics of the parties between November 4, 2004 and late January 2005 provide the crucial decision points for a judicial determination of procedural unconscionability. Slade testified that the impact of the proposed price increases was approximately $1 million, a significant impact on the business. *Id.* at 65. Given the alleged enormity of the impact, Whirlpool's representatives hardly fully engaged on the problem coincident with its asserted magnitude.

Winnick transmitted a message on November 4, 2004 concerning the need for price increases. *Id.* at 54. The size of the demand was increased tenfold a month later to include sixty parts. *See* Pl.'s Trial Ex. 3. Inexplicably, there was no timely effective response from Whirlpool. The first reference in this record of a Whirlpool substantive response is Exhibit 3 in which Winnick references a November 30 telephone conversation. In that same exhibit, a Winick email of December 2, Grigoleit conveys price options based on quantity. There is no substantive contact from Whirlpool until December 8 (another six-day gap). Trial Tr. vol. I, 54–55, ECF No. 110; Pl.'s Trial Ex. 4. Winick testified, without contradiction, that he called every business day between November 30 and December 8. In the December 8 email, Slade asks for cost structure data (cost drivers). Until December 17, on which date a face-to-face meeting occurs, Whirlpool

continues to insist on cost drivers and Grigoleit continues to tell Whirlpool no such information exists. *See* Trial Tr. vol. III, 429–31, Dec. 18, 2008, ECF No. 112.

Whirlpool makes much out of Defendant's failure to provide cost drivers. However, Whirlpool concedes that Grigoleit had no legal obligation to provide the information. Clearly, from Whirlpool's internal perspective, receipt of cost drivers information was the factual predicate for Whirlpool's consideration of a price increase. Trial Tr. vol. II, 246–47, ECF No. 111. The Court has no quarrel with Plaintiff's desire for the information and when it was not forthcoming, concluding that the supplier's position was "unusual." Trial Tr. vol. I, 63, ECF No. 110. However, Whirlpool had choices in the face of reality that cost information was not forthcoming. It chose to dawdle and incessantly ask for the same information even in the temporal context of a cessation of parts supply as of January 31, 2005, as discussed below. Def.'s Trial Ex. W. In the best of all possible scenarios, Whirlpool would have received its cost information. The Court is satisfied that Defendant did not have the discrete information Plaintiff sought. Failure to provide the cost-driver information is not in this Court's judgment evidence of bad faith. If there is no legal obligation and the requested data did not exist without expense which Whirlpool implicitly declined to pay, it is unavailing to assert that failure to perform the obligation can supply evidence that the party was acting in an unconscionable fashion.

Five days after the December 17 face to face meeting, and with no substantive communication from Whirlpool leading to resolution, Grigoleit conveyed a deadline of January 31, 2005 for the cessation of parts delivery. *See* Pl.'s Trial Ex. 7. Whirlpool forcefully asserts that the timing, three days before Christmas, evidences bad faith and all manner of indignity. The Court does not accept that argument. Whirlpool is an international corporation with a large workforce of dedicated professionals. Undoubtedly, it would have been more convenient if this dispute had occurred in June to avoid interference with holiday vacation plans. But Whirlpool finds itself in the untenable position of claiming catastrophic consequences for the company if the part supply line is interrupted. And yet its employees cannot work over the holiday period to avoid such Armageddon? This argument is especially unavailing in light of the gap periods of communication between the parties between November 4 and December 22. In that time period, weeks passed before Grigoleit received a return communication of any substance, except of course for the repeated requests for cost data.

Whirlpool also claims that the January 31 cutoff date was outrageous. Once again, however, Whirlpool's failure to respond is critical. Quite explicitly, Winick states in his December 22 email that the January 31 date is not a "drop dead" date. Winick specifically states that Defendant will consider an alternative cutoff date if advised by January 3. *See id.* While Plaintiff objected to the January 31 date on December 28, Def.'s Trial Ex. T; Pl.'s Trial Ex. 7, Whirlpool **never** proposed an alternative date. Trial Tr. vol. I, III, 148–49, 528, ECF No. 110, 112. Clearly, as to this important aspect of supply cutoff, Whirlpool was not left with a "take it or leave it" proposition. By December 27, Whirlpool had yet to formulate a response to the December 22 email. On December 28, Slade requests—yet again—cost structure and objects to the January 31 date, but fails to request, suggest or even hint at an alternative cutoff date which Winnick

asserted Grigoleit was open to considering.  Efforts for another face-to-face meeting yielded a date of January 3, 2005 due to the unavailability of Derek Loikits or other Whirlpool personnel.

A face to face meeting occurs on January 3.  Whirlpool <u>still</u> does not have a counter-proposal.  *See* Pl.'s Trial Ex. 16.  Possible patent infringement issues are raised for the first time.  Trial Tr. vol. IV, 699–702, ECF No. 113.  On January 6, agreement is reached on one aspect of the dispute—unique raw materials.  *See* Pl.'s Trial Ex. 17.  Eight days later, Defendant offers another proposal.  Pl.'s Trial Ex. 18.  In the urgent time frame which Plaintiff asserts is evidence of unconscionability, Whirlpool does not respond for 13 days, finally stating that Exhibit 18 is unacceptable.  On January 27, Whirlpool does object to Defendant's pricing and terms, stating that Plaintiff expected good faith negotiations.  *See* Pl.'s Trial Ex. 19.  While Whirlpool's concerns of good faith negotiations may be understandable, as of this point in the chronology, the Court cannot conclude bad faith on Defendant's part to this point in the ever-developing dialogue.

That said, t**he January 31 date arrives and Plaintiff has still not made an offer to Defendant.**  On that date, Plaintiff makes its umpteenth request for cost data.  Grigoleit terminates the open purchase orders.  Trial Tr. vol. I, IV, 92–93, 713–14, ECF No. 110, 113.  On February 3, 2005, Whirlpool makes its first offer, Exhibit 23, of a twenty percent price increase for all parts and a minimum volume commitment.  In sharp contrast to Plaintiff's slow turn-around responses, Defendant virtually immediately rejects with a counter-proposal.  Pl.'s Trial Ex. 24.

Further into the month of February, proposals and counter-proposals were exchanged.  The parties in this time frame (for the first time) are engaging in substantive, albeit strained negotiations, regarding subject matters of price and volume among other issues.  Blanket orders have been terminated and Whirlpool's supply chain is dissipating.  Trial Tr. vol. IV, 714, ECF No. 113.  However, in this time frame, Defendant suddenly introduces for the first time the subject matter of "extrinsic costs."  *See* Def.'s Trial Ex. AV.  Defendant asserted that it was incurring costs in further negotiations with Plaintiff and with plant operations given the fluidity of the business dynamic with Whirlpool.  Defendant demanded $10,000 a week additional compensation for each week beyond February 1 if an agreement was not reached the next day.  *Id.*  The Court does not accept Defendant's assertion of increasing costs. How Grigoleit could possibly quantify "extrinsic costs" given its antiquated accounting system is lost on this Court.  It represents yet another *ipse dixit* position.  This demand came at a critical time in the negotiations when product interruptions were of particular difficulty to Whirlpool.  The Court finds that this heretofore unmentioned potential term of the contract was nothing more than a turning of the screw of Plaintiff and represented bad faith on Defendant's part.  While Whirlpool placed itself in a difficult position until February 21, the Court finds that Whirlpool was negotiating in good faith from February 3.  Evaluating the facts in equity as the Court must, as of February 3, Whirlpool had placed itself in a position of having to accept even exorbitant price increases for Defendant's parts, even ones that "shocked the conscience" within the meaning of the case law.  However, Grigoleit's negotiating position in its February 21 email concerning totally undocumented "extrinsic costs" provides a "quantum" of procedural unconscionability which tips the balance toward Whirlpool on this component of the final agreement.

Requesting additional money as a condition of settlement left Whirlpool no choice. Indeed, Whirlpool accepted the pricing demanded by Defendant the next day. *See* Pl.'s Trial Ex. 28. The demand for $10,000 additional per week was substantively unconscionable (because the proofs are unsatisfactory from Defendant to justify it) and procedurally unconscionable because Plaintiff did not have a choice in that time parameter. Accordingly, the Court sets aside the $40,000 of "extrinsic costs" ultimately agreed to by the parties. *See* Trial Tr. vol. I, IV, 115–16, 875, ECF No. 110, 113. The request for "extrinsic costs" may have been the final catalyst for agreement. The final agreement of the parties as to price was consummated the next day. *See* Pl.'s Trial Ex. 28. Volume guarantee negotiations continued.

Also, during the February 2005 time period, Grigoleit abruptly requests that any price increase be implemented retroactively to November 2004. *See* Trial Tr. vol. I, III, 115–17, 580, ECF No. 110, 112. The Court finds this aspect of Defendant's position troubling. Defendant had an obligation to fill orders under the open purchase orders until January 31, 2005. With the cutoff date passed and Whirlpool accepting a large price increase and continuing to negotiate on volume with no choice but to continue, it is obtuse to demand unreasonable price increases retroactively for an approximate three month period. Ultimately, Whirlpool, due to accounting restrictions, agreed to add eight percent to Defendant's price demands for all parts ordered under the agreement. *See* Trial Tr. vol. I, IV, 115–117, 875, ECF No. 110, 113. Once again, on this element of the "agreement," Whirlpool has met its burden on both prongs—substantive and procedural unconscionability. The Court sets aside this additional eight percent price increase as the product of procedural and substantive unconscionability.

After a flurry of final negotiations, the parties finalized an agreement on February 28, 2005.

Two other aspects of Whirlpool's position require comment. On January 3, Defendant raised the possibility of patent infringement. Trial Tr. vol. IV, 699–702, ECF No. 113. Grigoleit's witnesses claimed at trial that the company would have cooperated with Whirlpool for the transfer of the tooling. *See* Trial Tr. vol. I, 149, ECF 110. Plaintiff argues that subsequent events, *i.e.*, a patent lawsuit filed by Defendant in summer 2005, puts a lie to the claims of cooperation. However, the Court must evaluate an unconscionability claim as determined by the facts and circumstances at the time of the contract, not facts and circumstances which occur later. *See Andersons*, 166 F.3d at 323. Whirlpool did nothing to test the assertion of cooperation of the Defendant in the temporal context of November 2004–February 2005. Similar to the parts cutoff deadline, Plaintiff failed to pursue Defendant's pledges of cooperation and goodwill as to tooling transfer. Defendant admits that a lawsuit was "under consideration," *see* Trial Tr. vol. IV, 701, ECF No. 113, but firmly claims that the issues are unrelated and indeed had been told in 2003 by a Whirlpool employee to sue the company if Defendant disagreed with its position on the patent issues. In any event, *Anderson* precludes this Court's consideration of this aspect of Whirlpool's argument for unconscionability.

Whirlpool also claims that moving the tooling would have taken six months even with cooperation and Defendant knew that when it transmitted its cutoff date. Trial Tr. vol. I, 75, ECF No. 110. Indeed, once Whirlpool did decide to move the tooling to KI/Phillips in June 2005, it

took six months.  However, having decided to sole source the parts, Plaintiff knew of its exposure if retooling was necessary.  They cannot now be heard to complain of the adverse consequences of that business decision.  Also, as previously indicated, Plaintiff never suggested an alternative cutoff date from January 31.  The Court cannot speculate on how Grigoleit would have responded had Whirlpool suggested an alternative cut-off date.  Such an approach by Whirlpool would have clearly mitigated the implication of a tool transfer time period, yet Whirlpool did not pursue it.

Accordingly, the Court finds that Whirlpool cannot sustain its position of procedural unconscionability except as to the retroactivity of the eight percent price increase and the $40,000 of extrinsic costs that Defendant demanded.  Therefore, the "agreement" was a valid contract in part and Plaintiff had the obligation to perform the contract as amended by this opinion.

## **Damages**

Having ruled that the contract was not unconscionable, except in part, the Court must calculate damages.  Based on Grigoleit's proposed findings, Def.'s Corr. Post-Trial Br., ¶ 184, ECF No. 121–2, the Court understands its demand to total $246,858.57 for parts delivered pursuant to the agreement for which payment has not been received.  By previous order, Grigoleit claims $100,000 under paragraph 5 of the agreement.  *See* Def.'s Trial Ex. BG.  Whirlpool asserts a credit of $15,601.51 for parts that were not included in Whirlpool's firm orders.  *See* Trial Tr. vol. II, 238–241, ECF No. 111; Pl.'s Trial Ex. 44.  Subject to provisions of this opinion below, the Court accepts those calculations.

The Court has found the $40,000 extrinsic cost provision unconscionable.  Whirlpool shall have a credit for that amount.

The Court has set aside the eight percent retroactivity increase.  Whirlpool asserts that it paid $2,139,865 for parts pursuant to the agreement.  *See* Pl.'s Proposed Findings of Fact, ¶ 80, ECF No. 118.  The parties will seek agreement on the credit amount that Whirlpool should receive resulting from the Court's unconscionability finding as to the eight percent increase.  If agreement is not had within twenty-eight (28) days of this opinion, Plaintiff and Defendant will make simultaneous submissions to the Court with support thereof (not to exceed fifteen (15) pages) within fifty-six (56) days of this opinion.  Thereafter, the Court will decide the issue by order.

The parties will attempt agreement on a prejudgment interest calculation within fourteen (14) days thereafter.  If agreement cannot be had, Grigoleit shall submit a interest calculation.  The calculation shall include the interest until the day of the submission.  If  Whirlpool disputes the prejudgment interest amount, it shall have fourteen (14) days from the date of Defendant's filing to object and/or provide a counter proposal.  As with the eight percent credit issue, the Court hopes mutual agreement can be reached.

**Conclusion**

The Court will enter a favorable declaratory judgment in part consistent with this opinion in favor of Whirlpool and a judgment of no cause for action in part consistent with this opinion.

Grigoleit shall have a judgment on its counter-claim in the amounts calculated pursuant to the Court's direction herein as supplemented by subsequent orders of the Court issued pursuant to this opinion.

**IT IS SO ORDERED**.


DATED:   August 31, 2011                             /s/ Paul L. Maloney
                                                    Paul L. Maloney
                                                    Chief United States District Judge